[Civ. No. 302.   Fourth Appellate District.—July 23, 1931.]

BANK OF ITALY NATIONAL TRUST AND SAVINGS ASSOCIATION, as Executor, etc., Respondent, v. R. D. SPICER, Appellant.

Wright & McKee and C. M. Monroe for Appellant.

Ray M. Harris for Respondent.

BARNARD, P. J.—This is an action to recover money paid for certain stock in a corporation, which stock was never delivered. The general situation leading up to the controversy is as follows: Thomas J. McLemore, a business man of large experience and considerable success, came to California for his health in 1919, being then about sixty-eight years old, and settled at Escondido about thirty-five miles from San Diego. Early in the spring of 1924 he met R. D. Spicer who was vice-president of and manager of the San Diego office of Stephens & Company, a firm dealing in investment securities. He developed a very considerable confidence in Mr. Spicer, and made a number of investments through him. In June, 1925, Spicer organized the San Diego Ice & Cold Storage Company, of which he became president. On June 24, 1925, Spicer, McLemore and a number of others, signed an agreement providing that a corporation should be organized to take over an existing ice business, that Stephens & Company should receive a certain proportion of the stock for their services in organizing the corporation and acting as "syndicate manager", and that the signers should pay $105 for each unit of five shares of class A and one share of class B stock the said stock to be paid for within fifteen days after August 14, 1925, upon demand therefor by Stephens & Company. McLemore signed for 500 shares of class A stock and 100 shares of class B stock, agreeing to pay therefor $10,500, and on November 10, 1925, gave his check to Spicer for that amount. Spicer cashed this check and gave to McLemore a receipt acknowledging full payment for the stock. Of the parties signing this subscription agreement, ten received their stock in September, 1925, one in October, 1925, three in January, 1926, one in April, 1926, and one in March, 1927, some months after Stephens & Company had gone into bank-

ruptcy. McLemore and one other subscriber never received any stock. McLemore was adjudged incompetent in October, 1928, and this action was filed on November 9, 1928, by him through the Bank of Italy National Trust & Savings Association, as his guardian, and after his death continued by his executor.

The original complaint set up three causes of action and at the conclusion of the taking of evidence, an amended complaint was filed, with the permission of the court, which also set up three causes of action. In the amended complaint, in the first cause of action, it is alleged that on November 10, 1925, McLemore gave to Spicer his check for $10,500 under Spicer's agreement to obtain for McLemore, in accordance with a prior arrangement known as the "original underwriting agreement", 500 shares of class A stock in the San Diego Ice & Cold Storage Company; that Spicer cashed this check and never delivered or caused to be delivered the stock, nor returned the money; that up to the beginning of the year 1927 Spicer repeatedly assured McLemore that the stock had been obtained for him and would presently be issued to him; that about January, 1926, Spicer wrote McLemore that the stock would be issued and the dividends taken care of; that McLemore believed and relied upon these representations until January, 1927, when he first learned that Spicer had not obtained the stock for him and that it had not been issued in his name, and when for the first time Spicer refused to deliver the stock or return the money; that during all that period the San Diego Ice & Cold Storage Company was issuing its stock and would have issued the 500 shares to McLemore had Spicer paid to the company the $10,500 placed in his hands by McLemore; and that, in fact, Spicer converted the money to his own use. It is further alleged that during that time McLemore was a man of advanced years, feeble in mind and body, and by reason of loss of memory, failing mental powers and senile dementia, was from about the first day of June, 1925, continually until the time of his death wholly incompetent to transact any business whatsoever, and incapable of caring for his property or understanding the nature or effect of his acts, and was entirely without understanding during that period in the sense that he was incapable of understanding the nature, purpose

or effect of the transaction mentioned, and that during all of that time Spicer knew of such physical and mental condition of McLemore. The prayer is for $10,500 with interest at seven per cent from November 10, 1925, less $656.25 dividends on said stock, which it is alleged the defendant caused to be paid to McLemore notwithstanding the stock had not been issued in his name. The second cause of action repeats most of the matters alleged in the first cause of action, and also alleges that when the $10,500 was paid and when Spicer promised to obtain the stock for McLemore in consideration of such payment, Spicer made such promise with no intention of performing it, but with the intention of cheating and defrauding McLemore, and that McLemore believed the promise and relied thereon to his damage in the same amount. In the third cause of action the matters alleged in the first cause of action are repeated and in addition it is alleged that Spicer pursued a course of friendly conduct for the purpose of gaining McLemore's confidence; that while McLemore was of an advanced age and Spicer was a man of about forty years of age, Spicer made a practice of visiting McLemore in Escondido and holding long conversations with him; that on several occasions he invited McLemore to his home, took him out to lunch when he was in San Diego, gave him a visitor's card at a social club in San Diego, gave him expensive books, pretended especially to be his friend and to enjoy his society and company, and pretended a great interest in assisting him in the management of his business; and that such acts of intimacy commenced in 1924 and continued until 1927, when the actual nature of Spicer's acts was discovered. It is further alleged that these attentions on the part of Spicer were carried on in bad faith and with the fraudulent purpose of causing McLemore to entrust him with his business affairs and that, in fact, they had that effect. It is further alleged that on and prior to November 10, 1925, Spicer, with the fraudulent intent to deceive McLemore, represented to him that he would obtain for him on the advanced sale thereof and at a particularly attractive price, the said 500 shares of class A stock; that McLemore was induced thereby to pay Spicer the said $10,500, on said promise to obtain such stock for him; that on or about September 28, 1925, Spicer falsely represented

to McLemore that he actually had the stock in his possession, and that on October 30, 1925, he falsely represented to McLemore that he was carrying the stock for McLemore; that these statements were made for the purpose of deceiving and did deceive McLemore; that in reliance on such statements McLemore paid the said Spicer the $10,500 to obtain the delivery of said stock; and that such statements were false, were known to have been false when made, and were wilfully made in pursuance of a desire to deceive McLemore. It is further alleged that Spicer did not pay the sum of $10,500 to the San Diego Ice & Cold Storage Company for said stock, and that the various false representations were made both to deceive McLemore and to prevent his recovering from Spicer, either the stock or the money.

In his answer Spicer admits the receipt of the money, but denies that he agreed to obtain the stock for McLemore. He sets up the subscription agreement of June, 1925, and alleges that McLemore agreed to pay to Stephens & Company $10,500 within fifteen days after August 14, 1925; that he failed to pay the same within that time; that at his request that sum was advanced by Stephens & Company and paid to the ice company; that at McLemore's request and to protect Stephens & Company for such advance, Spicer executed his own note to Stephens & Company; that thereafter, in pursuance to that arrangement, McLemore paid Spicer the $10,500 and Spicer's note to Stephens & Company was paid in full. It is further alleged that 100 shares of class B stock were issued and delivered to Mc-Lemore and that the 500 shares of class A stock were fully paid for to the ice company, issued by it and held by Stephens & Company as collateral to secure the advance by it of the purchase price of the same, all with McLemore's knowledge and consent. It is alleged that he never promised McLemore to sell the stock to him, to buy it for him, to procure it for him, or to cause it to be delivered to him; that he informed Stephens & Company and the ice company of the interest of McLemore in the stock, and that the entire transaction was with Stephens & Company and not with him; and that McLemore received 100 shares of class B stock and also certain interest, and three stock dividends paid by the ice company. It is further alleged that on December 29, 1926, Stephens & Company was adjudicated a bankrupt, and that

thereafter McLemore filed a claim in the bankruptcy proceeding to the effect that the money in question had been paid to Stephens & Company; that his claim was allowed by the referee in bankruptcy; and that McLemore thereby elected to pursue his remedy against the bankrupt corporation and had no right thereafter to pursue it against Spicer individually. The answer also denied that McLemore was entirely without understanding and denies all of the allegations as to fraudulent conduct.

The action was tried before a jury and resulted in a verdict for the plaintiff. From the ensuing judgment this appeal is taken. A large number of points are raised and the case has been most ably presented by counsel on both sides. To comprehensively treat all of the points raised would make an opinion of undue length, but most of the contentions of appellant may be boiled down to two propositions, which are as follows: 1. That the plaintiff has sued the wrong party, that the appellant was merely a go-between, and that the entire transaction was with Stephens & Company and not with the appellant personally. 2. That the evidence is not sufficient to show that McLemore was entirely without understanding, as contemplated by section 38 of the Civil Code, but that, at the most, he was a person of unsound mind and under section 39 of the Civil Code, a recovery could not be had without a rescission and the restoration of what had been received. As appellant says in his brief: "Had the evidence shown the contract with R. D. Spicer as alleged in the pleadings, little difficulty would be encountered if the court was satisfied that McLemore was a person entirely without understanding." These two questions are largely decisive of this appeal, and both being questions of fact, it will be necessary to further examine the evidence, as to whether it sustains the verdict of the jury.

First taking up the question as to whether the transaction was entirely with Stephens & Company. It is fully apparent from the record that by June, 1925, Spicer had so won the confidence of McLemore that he took his advice on investments, exclusively. Spicer was then promoting the San Diego Ice & Cold Storage Company, of which he became the president. The underwriting agreement of June 24, 1925, did not purport to be an agreement

with Stephens & Company, nor did that company sign it. It merely set forth that the parties thereto subscribed for stock in the ice company on terms stated, and that Stephens & Company should act as syndicate manager and should receive certain stock in payment for their service. It also provided that the subscribers should pay for their stock in cash within fifteen days after August 14, 1925, "upon demand therefor by Stephens & Company". It appears that most of the subscribers received their stock in September, 1925. It appears that no stock was ever issued in the name of McLemore, but that 1,000 shares of class A stock were issued to Stephens & Company on September 18, 1925, and 2,834 shares were issued to Spicer, although he had subscribed for but 1500 shares. McLemore did not pay for his stock on August 29, 1925, as provided for in the subscription agreement. Spicer claims that Stephens & Company advanced the money to pay for McLemore's stock, with others; that the stock was issued and held by Stephens & Company as security, and that he himself gave to Stephens & Company his note dated September 26, 1925, for $94,500, covering 4,500 shares of the stock, and that this note was later paid. However, it appears that a large portion of this stock, supposed to have been held by Stephens & Company as security, was delivered to the various subscribers in September. While Spicer's note to Stephens & Company was paid in full, there is no record of any payment of $10,500 on this note at any time. The first thing that appears in evidence after the subscription agreement was signed, is Spicer's letter to McLemore dated September 28, 1925, in which he says he is sending him 100 shares of class B stock, and says: "I'm not using this stock on your note secured by class A stock so I think you better put it in your safety-deposit box." Not only would it appear that this class B stock could not have been issued unless the corresponding class A stock was also issued, in accordance with the subscription agreement, but it also would appear that the stock had been issued and was then being held by Spicer as security on a note given by McLemore. On October 29, 1925, McLemore wrote Spicer that he was sending him a check for $2,892.94 "in payment of my note and interest to date". He also mentioned collateral security on the note and says Spicer can either send it to him or

hand it to him the next time they meet. Spicer replied on October 30, 1925, acknowledging receipt of the money, returning the canceled note, and says:

"This transaction completed your payment on our note arrangement but it has nothing to do with our exchange of collateral. I am simply carrying for you 500 shares of Class A Ice stock with some of your San Diego Oil Products, that I had on a note with you, as collateral.

"As I told you the other day I am carrying the ice stock very comfortably and there is no rush about your taking it up at the end of six months. Probably some time during the next three or four months you will want to sell some of the ice stock and at that time I will hand back your San Diego Oil Products and close up the transaction."

McLemore wrote Spicer on October 31, 1925, saying, in part, as follows:

"I also note that you are carrying 500 Class 'A' Stock in San Diego Ice & Cold Storage Co. for me which I may conclude to sell in the next three or four months. In the meantime you are holding San Diego Oil Products Stock will be returned to me in case I do not sell the Ice Co. Stock.

On January 2, 1926, Spicer wrote McLemore as follows:

"I carried your stock, totaling $10,500, from September 1st to November 10th at 6% amounting to $122.50. You received from the company 7% interest on $12,500, or 500 shares of stock, being a total of $291.67. This $291.67 less the $122.50 makes a total due you of $169.17.

"In the future the stock will be issued and will be taken care of through dividends."

In the meantime, on November 10, 1925, McLemore gave Spicer a check for $10,500 payable to him personally. This was indorsed and cashed by Spicer, and the following receipt given:

"Nov. 10, 1925.

"Received from T. J. McLemore 10500 payment dollars in full for 500 shares Class A stock San Diego Ice & Cold Storage original underwriting. $10,500.

"(Signed) R. D. SPICER."

It appears that no stock was ever issued to Stephens & Company which is identified as the McLemore stock. After Stephens & Company had gone into bankruptcy, McLemore's daughter told Spicer that they had nothing to show

for the stock, and Spicer had one of the clerks in the office give her the following letter:

"Mr. T. J. McLemore,

"Escondido, California.

"Dear Sir: We have today received for your account 500 shares of San Diego Ice & Cold Storage Company A common.

"(Signed) STEPHENS & COMPANY,

"By CLARK,

"Assistant Secretary.

"Dated August 12, 1926."

That was handed to Miss McLemore by Spicer in February, 1927, Spicer saying: "I have had Mr. Clark write this memorandum for you in the form of a letter and dated it back to the time that the deal took place." If this was correct, it shows that Stephens & Company did not receive the stock until nine months after McLemore had paid for it. However, the record shows that the only entry in the books of Stephens & Company was under date of August 12, 1926, and shows that on the same day 500 shares of this class A stock was received from McLemore "as customer's security" and delivered to Spicer as customer's security. It is also significant that the final records of Stephens & Company when they went into bankruptcy, show an entry on their books to the effect that there were "short" to Spicer 1,000 shares of this class A stock. While counsel argue that these last two items were intended to show that Stephens & Company were short 500 shares to Spicer and 500 shares short to McLemore, the evidence does not bear out that conclusion. Spicer claimed to have carried the stock for McLemore until it was paid for. He personally collected interest during that period. He received the money personally, and gave a personal receipt for it. He claimed to be holding the stock as security for a note given by McLemore. Nothing whatever appears in the books of Stephens & Company until nine months after the stock was paid for, and then it appears to have been delivered the same day to Spicer, and the final books show the company short to Spicer. We think that all of the evidence, with the reasonable inferences to be drawn therefrom, indicate a separate deal with Spicer, and that it cannot be held, as a matter of law, that the entire transaction

was with Stephens & Company and that Spicer acted only as a go-between in handing the McLemore money to Stephens & Company.

The next question is whether the evidence is sufficient to show that McLemore was entirely without understanding. The record contains a great deal of evidence that McLemore had been failing physically and mentally for a number of years prior to this transaction, and unquestionably it appears that McLemore was, at least, a man of unsound mind. Considerable of this evidence is relied upon as showing that he was completely without understanding. His daughter, who tried to assist him in his business, testified to the things done by Spicer while gaining her father's confidence, and the various circumstances showing his growing mental weakness, and then testified that her father was insane on November 10, 1925, for several months prior thereto, and from that time continuously until his death. In giving her reasons for this opinion, she testified that he had changed entirely in regard to his consideration for and treatment of the family; that he looked blank and dull; that he had difficulty in carrying on a connected conversation; that he would say yes to anything anybody wanted him to do; that he could not remember stories while they were being read to him; that during 1925 he would laugh and cry without reason; that when he returned from a trip to Europe, where they took him with the hope of benefit, he could not tell anything about the trip; that she tried to find out about his business but he was unable to explain things to her; that he would lose control of himself in church; that she could not trust him to go downtown alone or to a bank alone, because he would drop important papers; that he could not balance himself and had to be helped in walking; that he went to Spicer's office whenever he went to San Diego; and that after trying many other things, they called in a specialist in mental diseases in the fall of 1925. McLemore's wife testified to the same effect. Dr. Larzalere testified that he took care of McLemore from 1919 to 1925; that in 1923 and 1924 he was beginning to have senile dementia; that he was then more or less confused and his memory began to fail, and that all of these symptoms increased as time went along; that his condition was more pronounced before he went to Europe in 1924, and that

after he returned his condition was worse; that he was unable to hold his urine; that the trouble was not with his bladder but was with the brain control; that in December, 1925, he advised the family to take him to a specialist in mental diseases; and that in his opinion McLemore was insane in the fall of 1925. As reasons for this opinion, he gave the following: That he was not able to concentrate or remember; that he could not control his bladder, the trouble being caused by degeneration of the brain; that his general appearance, gait, and facial expression indicated insanity; that he was unable to put on his clothes and could not think how to do it; that all of this grew worse in the fall of 1925, caused by a degeneration of the brain; and that he had senile dementia. McLemore's banker testified that his condition in 1924 was most lamentable as compared with his condition in 1919; that after he returned from Europe in the fall of 1924 his condition was much worse; that he saw McLemore frequently; that he kept getting worse during the year following his return from Europe; and that during the summer and fall of 1925 he was insane. As reasons for this opinion he stated that he had a far-away look in his face; that he was not able to carry on an intelligent conversation; that when he started a sentence he could not complete it; that he could not express himself and would go to sleep while talking or while anyone was talking to him; that while in earlier years he had frequently discussed business matters with McLemore, in later years he did not do so because it was distressing to discuss such matters with him; that in the spring of 1924 he advised McLemore not to buy stock in Stephens & Company, and that McLemore replied, "Yes, but they guarantee me 7 per cent"; that he gave him many reasons why he should not buy the stock but McLemore would only keep repeating the same statement; that he finally gave him up in despair because he was unable to make McLemore understand what he had been telling him (we may insert here that McLemore went ahead and invested $50,000 or $60,000 in stock in Stephens & Company); and that on another occasion, in 1924, he talked with McLemore about an investment in the Occidental Security Company, a subsidiary company of Stephens & Company, and in spite of what he told him, on that same day McLemore invested $42,000 in that stock. In addition, he stated be believed

McLemore was insane because of his looks, general demeanor, deportment and method of trying to converse; his inability to carry on an intelligent conversation; his inability to concentrate his mind on any thoughts; the fact that he would frequently start a conversation and be unable to complete it; that he would cry when there was nothing to cry about; and that he would pass his urine in public places and that this did not seem to embarrass him, although he had previously been a most fastidious man.

Dr. Ridley testified that he started to treat McLemore in December, 1926; that he was unable to carry on a conversation, had lost control of his bladder, and was unable to balance himself; and that he was insane from the time he first saw him until his death. As reasons for this opinion, he gave facts similar to those already narrated. H. F. Bloom testified that he had known McLemore since 1918 and that he had been a close friend; that he was insane on November 10, 1925, and from that time until his death; that his face and eyes were expressionless, and that he could not concentrate his thoughts or carry on a connected conversation; that he could not balance himself; that after he came back from Europe he was a stricken man; that in the fall of 1925 he appeared to have no opinion; that he would laugh and cry without reason; and that he could not carry on an intelligent conversation during the summer and fall of 1925. H. R. Greaves testified that he had known McLemore for more than fifty years and frequently saw him after 1922; that McLemore was insane from November 10, 1925, and continuously until his death; that the expression of his face was indicative of that condition; also his inability to carry on a connected conversation; that he would laugh and cry without reason; that he apparently had no interest in what was taking place around him; and that during all of the year 1925 he could not recall that he carried on an intelligent conversation on any subject. Dr. Little, a specialist in mental diseases, testified that he examined McLemore on December 1, 1925, and that he was insane at that time. He based his opinion upon the following physical neurological and mental findings from his examination: That owing to a physical condition his brain was not able to function normally; that there was a definite degeneration of the brain cells and of the nutritional carrying system to the

brain. He was asked a hypothetical question embodying the evidence up to that time concerning the mental and physical condition of McLemore, and in reply to said hypothetical question gave his opinion that a man in that condition was insane. On cross-examination he testified that McLemore was suffering from dementia of a type that is progressive and not curable; that the mental condition of McLemore had been progressing for many years prior to 1925, but that the change in the brain cells, as the result of the condition, had probably occurred a year or a year and a half before that time; that this dementia had been produced by degeneration in the brain; and that there had been a softening and breaking down of the actual cells in the brain. Two other doctors testified that McLemore was insane in 1926 when they examined him, giving their reasons for the opinion.

Appellant, while admitting that McLemore "had deteriorated considerably mentally", earnestly insists that he was conclusively shown to be not entirely without understanding by the fact that he served as a director of the San Diego Ice & Cold Storage Company and regularly attended directors' meetings, and more especially by certain letters written by McLemore on October 29, 1925, October 31, 1925, November 12, 1925, and May 1, 1926. In reference to the directors' meetings, there was evidence that McLemore appeared childishly flattered by being made a director; that when he attended meetings members of his family brought him to San Diego and Spicer took him by the arm and assisted him to the meetings; and that he took no part in the meetings while there. In reference to the letters, while they do not affirmatively show that he was not capable of understanding the transaction involved, they do show that he did not understand it. There is no evidence that he was not assisted in writing the letters, although he seems to have required assistance in almost everything. Dr. Little, the specialist in mental diseases, was shown these letters and asked whether, taking into consideration his own examination of McLemore on December 1, 1925, and assuming that the facts assumed in the hypothetical question previously asked him existed concerning Thomas J. McLemore, and also assuming that McLemore wrote these letters, whether or not these letters would cause him to

change his answers as previously given in the case. To this he answered, ''There would be nothing in the information furnished either by the letters or otherwise in the question that would give me any grounds to make a change in the opinion that is expressed at the original inquiry.'' In connection with the mental condition of McLemore, it is somewhat significant that, although Spicer continued to see him frequently between November 10, 1925, and January, 1927, McLemore never asked him for the stock. While there is some evidence tending to show McLemore was a person of unsound mind but not entirely without understanding, there is other evidence tending to show that he was entirely without the capacity to understand business transactions. After carefully reviewing all of the testimony, we are of the opinion that there is sufficient evidence to sustain the finding of the jury upon that question of fact. (*Jacks* v. *Estee,* 139 Cal. 507 [73 Pac. 247].)

Appellant next claims that the plaintiff is estopped from prosecuting this action, the deceased having theretofore elected to pursue another remedy. This is based upon the fact that a claim was filed by McLemore in the bankruptcy proceedings of Stephens & Company, and allowed. This claim as filed, was for $28,733.75 and included 500 shares of this class A stock. Assuming that this would have been an election under ordinary circumstances, if McLemore was a person without understanding and without sufficient knowledge and understanding of the facts involved to make an election, none was in fact made, and the circumstances would not constitute an estoppel. A question of fact was here presented, which was submitted to the jury under appropriate instructions by the court. In this connection, McLemore's daughter testified that in a conversation in Spicer's office after the bankruptcy proceedings were begun, Spicer said he was fixing up the claims for several of the creditors and offered to prepare her father's claim if he wanted him to; that her father said nothing but yes; that he did not seem to be interested in the matter; and that he picked up a newspaper and looked at it while Spicer was talking. She further testified that the next time they came to the office, her father signed the claim, and Spicer said that a certain attorney was representing some of the creditors, and asked her father if he would like to have

him file the claim for him, to which the father replied, "It will be all right". It appears that the claim was left there and Spicer attended to it; that her father did not attend any of the creditors' meetings; and that he took no further interest in the matter. In view of the other evidence as to the condition of McLemore at the time, it could well be held that Spicer was estopped from claiming any benefit from the filing of this claim.

█ A number of other points are raised which we feel it is unnecessary to discuss at any great length. It is urged that the court erred in permitting the plaintiff to file an amended complaint, as this entirely changed the cause of action. It is first claimed that an allegation in the first count of the original complaint to the effect that the defendant agreed to purchase for and deliver to the plaintiff 500 shares of class A stock in this corporation, was so amended as to allege that the defendant agreed, in accordance with the terms of the original underwriting agreement, to obtain for McLemore 500 shares of class A stock, and that this constituted such a change in the cause of action as could not be justified as an amendment to conform with the proof. This goes to the first proposition discussed in this opinion, and is based upon appellant's theory that the entire transaction was with Stephens & Company and that the money was paid to him only to reimburse him for what he had already paid out for the benefit of the respondent. As we have pointed out, we think the evidence shows a transaction with Spicer individually. The change was in the form of the allegation only, and not in the essential cause of action. █ It is also urged that the cause of action was entirely changed, in that the first cause of action alleged that McLemore was incompetent but not that he was wholly without understanding, while the amendment alleged that he was entirely without understanding. In the original complaint, it was alleged that McLemore, during all of the times alleged, was incompetent to transact any business whatsoever. While this is more fully alleged in the amended complaint, and an entire lack of understanding is there alleged in express terms, no change in the cause of action appears. All three counts of both the original and the amended complaints apply to the same transaction, and apply for the same relief. In our opinion, no error is

shown in permitting the amended complaint to be filed. (*Frost* v. *Witter*, 132 Cal. 421 [84 Am. St. Rep. 53, 64 Pac. 705]; *Lemon* v. *First Nat. Bank of Pasadena*, 191 Cal. 388 [216 Pac. 620]; *Sweet* v. *Hamilothoris*, 84 Cal. App. 775 [258 Pac. 652].)

In a number of points it is contended that the complaint is not sufficient to raise the issue of mental incapacity upon the part of McLemore. Such mental incapacity is alleged in each cause of action in both the original and the amended complaints. The complaints are sufficient to show a cause of action for money had and received, based upon an agreement which is alleged to be void due to a lack of understanding on the part of one of the parties. The attacks made upon the complaint are in fact based upon the appellant's idea of what should have been the respondent's theory. In our opinion, both the pleadings and the evidence disclose a case where the defendant had received money, which in good conscience he ought not to be allowed to retain.

It is next urged that the court erred in denying appellant's motion to require the plaintiff to elect between the three counts of the complaint. All three causes of action are for money had and received, and all have reference to the same transaction and seek recovery of the same identical sum. For this reason, the motion was properly denied. (*Tanforan* v. *Tanforan*, 173 Cal. 270 [159 Pac. 709]; *Rand* v. *Columbia Realty Company*, 13 Cal. App. 444 [110 Pac. 322]; *Goldwater* v. *Oltman*, 210 Cal. 408 [71 A. L. R. 871, 292 Pac· 624].)

Objection is made to the instructions given by the trial court on the ground that they are all argumentative, and many objections are raised to certain portions of individual instructions. Most of these objections are based upon the appellant's theory that it was conclusively established that the entire transaction was with Stephens & Company, and that McLemore was not a person entirely without understanding. The instructions are lengthy, and it would serve no useful purpose to set them out in full, which in itself would answer the objections made to portions thereof. We have carefully examined the instructions and in our opinion, they exhaustively cover every point raised and submitted to the jury, and we find no error therein justifying a reversal.

The record and briefs in this case are quite voluminous and it is impracticable in this opinion to thoroughly analyze and discuss each point raised. If we are correct in our view of the main propositions, first herein discussed, the action was fairly tried and correctly submitted to the jury.

The judgment is affirmed.

Marks, J., and Jennings, J., concurred.